**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TERI HANING, | : | |
| | : | **Case No. 2:14-cv-308** |
| Plaintiff, | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| v. | : | |
| | : | **Magistrate Judge Terrence Kemp** |
| THE HARTFORD LIFE AND | : | |
| ACCIDENT INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

This dispute under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, comes before the Court on the parties' cross-motions for judgment on the administrative record. (Docs. 13 and 14). Teri Haning alleges that The Hartford Life and Accident Insurance Company ("Hartford") wrongfully terminated her long-term disability benefits. Accordingly, Haning filed suit under 29 U.S.C. § 1132(a)(1)(B) to recover those benefits. Because Hartford acted arbitrarily and capriciously in terminating her benefits, the Court **GRANTS** Haning's motion and awards judgment to her.

### I.  BACKGROUND

#### A.  Factual Background

Teri Haning worked for JP Morgan Chase Bank ("Chase") as a Customer Care Research Associate. Her duties mostly consisted of entering data updates, performing data processing, and filing. She had to use a computer and telephone, and also was required to communicate verbally, both person-to-person and in group settings. She had to sit at her desk up to four hours at a time and seven hours per day, with the ability to alternate between sitting and standing as needed.

1

On October 1, 2010, Haning stopped working due to a series of debilitating migraine headaches.  Ultimately, doctors discovered an anterior communicating artery aneurysm, which they treated surgically.  Haning's neurologist opined that the aneurysm was unrelated to her migraines and, indeed, Haning continued to experience disabling headaches even after her surgery.  Her migraines are associated with nausea, vomiting, and sensitivity to light.

Haning's migraines form only the tip of the iceberg with respect to her physical and mental ailments.  She also complained of slurred speech, fatigue, inability to sleep, pain in her groin and right leg, weakness in her right leg, lower back spasms, neck pain, depression, and anxiety.  As a result of scar tissue that developed from repeated angiograms, the blood vessels in Haning's right leg have been permanently damaged.  Thus, she is only able to walk short distances with a cane and has fallen multiple times.  Due to documented degenerative spinal problems, Haning's radiologist recommended that she undergo epidural steroid injections, which she began on June 6, 2011.  Haning also suffers from fibromyalgia, which her primary care physician, Dr. Vargo, characterized as "severe at best."  Haning takes the prescription medication Lyrica to treat the pain associated with her fibromyalgia.  Dr. Vargo also noted that due to the pain from the water hitting her body, Haning ceased regular bathing and allowed her personal hygiene to deteriorate, often "wear[ing] the same clothes for a month without changing."  Finally, Haning suffers from depression and anxiety, which have rendered her essentially homebound.  She fears "being around people."  She gets "extremely agitated and fearful with the simplest tasks."  And she is "unable to interact with [others] and backs away from any confrontations."  Haning owns a registered service dog to assist with her anxiety.  Her therapist, Ms. Dickson, recorded that Haning struggles with daily chores, reports "major hibernation," and was "limited in her options for coping skills."

Due to this constellation of impairments, Haning applied for long-term disability benefits in May 2011, just as her short-term disability period neared an end.   In Hartford's "claimant questionnaire," Haning described her medical condition as follows: "chronic cluster migraines (can't see, live in the dark), swelling in neck [and] back (disc out, can't move head)." She also reported pain "from head to toe" due to her fibromyalgia, stated that she walks with a cane, and noted that she suffers from "major depression disorder" and experiences "constant panic attacks."   In response to a question concerning her cognitive functioning, Haning wrote: "[I] have a lot of trouble remembering, [my] son helps to pay my bills.  I get confused, [from] migraines."   On another form, Haning responded in like manner to a similar question by observing that her "mother has paid my bills, buys my medicine, drives me to and from appointments, [and that my] phone interferes with [my] migraine[s]."   When Hartford sent Haning a letter reminding her that the company was waiting for her to submit additional claims information, Haning responded as follows: "I have been working on this for a month.  I get very confused and frustrated trying to understand and write this out.  My son, [redacted], helped me by reading the questions to [help me] answer correctly."

Two of Haning's medical providers, Dr. Vargo, her primary care physician, and Deborah Dickson, her mental-health therapist (and licensed social worker), ultimately submitted Attending Physician's Statements ("APS") in support of her disability claim.  Dr. Vargo noted that Haning was "100% disabled" due to her anxiety and depression and could work "zero" hours per day.  Ms. Dickson noted that Haning's mental health issues would "preclude [her] from social/occupational functioning" and observed that she had "no ability" to perform repetitive or short-cycled work, to work under specific instructions, or to deal with people, among other occupational restrictions and limitations.

3

After reviewing the information in her file, Hartford initially approved Haning's claim for long-term disability benefits in a letter dated June 28, 2011.  Hartford informed Haning that to *remain* eligible for benefits, she must continue to meet the definition of "disabled" contained in Chase's Long Term Disability Group Benefit Plan ("the Plan").  The Plan, in turn, defines "disabled" as being prevented from performing one or more "essential duties" of "your occupation" for the first twenty-four months of long-term disability, followed by an inability to perform one or more "essential duties" of "any occupation" after that.  Accordingly, Haning was entitled to long-term benefits retroactively from April 4, 2011, until April 4, 2013— so long as she remained unable to perform one or more "essential duties" of a customer care research associate.  Haning likewise was eligible for long-term benefits even after April 4, 2013, so long as she remained unable to perform one or more of the "essential duties" of "any occupation"—*i.e.*, any occupation for which she was qualified by education, training, or experience, and that had an equivalent earnings potential.

Although Hartford approved Haning's claim, the company continued to investigate her eligibility for long-term disability benefits.  For example, Hartford solicited and received several more APS forms from various physicians.  Hartford interviewed Haning by telephone and noted that she "reported that she is not able to do much and that she basically lives in the dark." Hartford even arranged for two days of surveillance, which in some respects confirmed Haning's statements that she lived an essentially homebound life: surveillance personnel noted that they did not observe Haning on either day of surveillance.  Finally, Hartford prepared a form letter to Haning dated October 4, 2012, informing her that the company had decided to terminate her benefits, although Hartford left the termination date blank.  Hartford, for whatever reason, did not send the October 4, 2012 letter, but it remains in the administrative record nonetheless.

Around the same time, Hartford wrote to Haning reminding her that the applicable definition of "disabled" would change after two years and that, as of April 4, 2013, she must demonstrate that she was disabled from "any occupation."  Thus, Hartford told her, it had "instituted an investigation to determine if you will qualify for benefits on and after 4/4/2013." As a result of this investigation, Hartford informed Haning by mail on February 4, 2013, that the company was terminating her benefits as of February 10, 2013, because she no longer was disabled from her "own occupation."  Hartford also noted that it had determined Haning would not meet the definition of "disabled" beyond April 4, 2013, because Haning was not disabled from "any occupation" either.

### B.  Procedural History: Initial Termination of Benefits

On February 4, 2013, Hartford terminated Haning's long-term disability benefits, effective February 10, 2013.  Hartford based its termination on "policy language" and "the papers contained in [Haning's] file . . . viewed as a whole," including statements and correspondence from various physicians, a "Capacities Assessment" dated November 19, 2012, a "Physical Demands Analysis" for the position of Customer Care Research Associate, an "Employability Analysis," and a file review completed on January 21, 2013.  In short, Hartford's review concluded that Haning was not physically impaired from performing any of the "essential duties" of her occupation, nor did the clinical evidence "support the presence of a functional impairment related to [a] psychological condition."

As to the physical component of any potential disability, Hartford noted that a "Physical Demands Analysis received from [Chase] shows that Your Occupation is Sedentary" and that to perform those duties, Haning "must be able to sit, stand and finger, with occasional ability to crouch, reaching above shoulder, at waist level and below waist level and handling."

Hartford concluded that Haning could meet these demands because two attending specialists opined to that effect, and her primary care physician, Dr. Vargo, agreed to defer work restrictions to some of Haning's specialists.  As relevant here, Haning's neurologist, Dr. Sun, opined that, based on her last office visit on May 2, 2012, she was capable of working eight hours per day with the only restriction noted as not frequently lifting or carrying over fifty-one pounds of weight.  Dr. Rosenberg, a rheumatologist who previously diagnosed Haning with fibromyalgia, agreed that she could perform both "sedentary work" and "light work" on a full-time basis, as those terms are defined by the United States Department of Labor.  Dr. Vargo, for his part, agreed to defer Haning's work restrictions to Dr. Sun, despite Dr. Vargo's earlier APS, in which he indicated that Haning was "unable to work due to intractable headaches, depression, and severe pain."

As to the psychological component of any potential disability, Hartford determined that, based on a "Peer Review" of Haning's file, "the current evidence would not support the presence of a functional impairment related to [her] psychological condition, and [she is] characterized as being cognitively intact by [her] treating physician."  Hartford concluded that "[t]he clinical evidence does not support the presence of a functional impairing psychological condition."

Hartford noted that Haning's licensed therapist, Ms. Dickson, offered some support for her claimed disability, including notations that Haning suffered "anxiety problems" and had a minimal ability of expressing her personal feelings and making judgments or other decisions. Hartford's termination letter did not mention that Ms. Dickson also diagnosed Haning with "Major Depressive Disorder, Recurrent, Moderate," as having "chronic health issues" with respect to general medical conditions, as having "severe" psychological/environmental problems, or of scoring only 41 out of 100 in global assessment of functioning ("GAF").

Hartford's termination letter omitted other information from Ms. Dickson's mental health assessment as well, including notations that "[d]ue to chronic illness, [Haning] is unable to perform duties outside of minimal functioning ability," that she "is unable to perform daily hygiene tasks," and that her "inability to perform daily tasks is a depressant." When asked if a "psychiatric impairment exists," Ms. Dickson indicated Haning suffered from an "[i]nability to mobilize, related to chronic pain." Ms. Dickson also noted that this "psychiatric limitation" was expected to last "throughout [the] severity of chronic pain." Ms. Dickson rated Haning as having "No Ability" in nine out of twelve workplace activities, including the following: (1) directing, controlling, or planning activities of others; (2) performing repetitive or short-cycled work; (3) influencing people in their opinions, attitudes, and judgments; (4) performing a variety of duties; (5) working alone or apart in physical isolation from others; (6) performing effectively under stress; (7) attaining precise set limits, tolerances, or standards; (8) working under specific instructions; and (9) dealing with people. Ms. Dickson also indicated that she had treated Haning on a monthly basis for over a year and that Haning was taking medications for depression and anxiety.

Hartford's "Peer Review" discounted Ms. Dickson's findings regarding Haning's psychological impairments. As part of this review, Dr. Robert Pelc, a clinical psychologist, spoke with Ms. Dickson by telephone. In a summary of that conversation, Dr. Pelc noted that Haning "does adequately from a cognitive perspective," however, "she is very depressed related to her physical health problems, and also has social limitations because she does not go out related to her medical problems." In Dr. Pelc's words, Ms. Dickson "indicated that [Haning] was limited as a result of her physical health condition," and that any psychological imitations "would probably be better deferred to someone regarding her chronic pain."

Dr. Pelc summarized his conversation with Ms. Dickson in a letter to her as follows:

> Regarding specific return to work planning, you deferred essentially to her physicians, as you felt that her principal limitations were likely from the physical domain.  You thought that she would be able to function psychologically if there was some improvement in her physical condition.  You noted that she had a positive drive to have things better in her life, and her medical condition left her unable to perform most activities.

Dr. Pelc also spoke with Haning directly.  He noted that throughout the interview, Haning was difficult to understand, had to be redirected to questions, mispronounced words, and repeated herself.  Her speech was slow, labored, low in volume, and halted.  She stated that she lived in the dark, had panic attacks, and felt out of control.  She reported decreased memory, social avoidance, tearfulness, decline in physical functioning, and limited capacity to perform activities of daily living.  She could not understand why she had deteriorated to this level, was unable to remember things, had difficulty talking to other people, and was essentially "a hermit."

Despite these observations, Dr. Pelc summarily concluded from his review that "[t]he current evidence would not support the presence of functional impairment related to [Haning's] psychological condition."  He noted that Haning's anxiety was mostly a result of her physical health problems.  More specifically, he pointed to Ms. Dickson's purported statements that Haning was depressed as a result of her general physical malaise, was functioning adequately from a cognitive perspective, and was limited primarily by her physical health problems.  He also noted that Haning's therapy sessions occurred only monthly, which was not at a relatively intense level, and that Ms. Dickson allegedly deferred to Haning's treating physicians with respect to her ability to return to work.  He concluded as follows: "Absence of a functional impairment from her psychological condition at this time is supported by [the] modest level of treatment, principal focus on physical health concerns, and lack of objective evidence indicating the presence of a severe psychological disorder at this time."

8

Hartford asked Dr. Pelc to comment on any inconsistencies between his conclusions and the available medical information.  He stated that the only inconsistency came from Ms. Dickson's November 1, 2012 APS, which noted severe concentration and memory problems based upon Haning's self-reported statements.  Dr. Pelc, however, stated that based on his interview of Haning, he would characterize her cognitive functioning as "being generally within the normal limits range."  He also stated that Haning's treatment plan "is consistent with the standard of care for a non-impairing psychological condition" because she saw her therapist only once a month and had been prescribed relatively low dosages of Xanax and Celexa.  Based on Dr. Pelc's review, Hartford concluded that the clinical evidence did not support the presence of a functional impairment stemming from a psychological condition.

In the absence of a physical or mental impairment preventing Haning from performing one or more "essential functions" of her previous occupation or of any "other occupation," Hartford terminated her long-term disability benefits.  Hartford informed Haning that ERISA gave her the right to file an administrative appeal of that benefits termination, upon which Hartford would provide "a full and fair review."

### C.  Procedural History: Termination-of-Benefits Appeal

Haning appealed Hartford's decision to terminate her long-term benefits in a lengthy letter that described her family and workplace issues as well as her general medical condition. Ms. Dickson and Dr. Vargo also submitted letters in support of her appeal.  Ms. Dickson wrote that "Haning's anxiety and depressive issues appear related to her chronic illness."  She noted that Haning was "very distraught and is unable to complete daily tasks."  Ms. Dickson concluded that Haning was "unable to improve her situation medically" and further recommended "that she continue counseling to address her depression and adjustment to the limitations."

Dr. Vargo wrote at length "about [his] patient of 20 years" and her various ailments, including her continued battle with "severe intractable headaches and back pain."  He also hearkened back to her fibromyalgia, which he described as "severe," and mentioned that her therapist, Ms. Dickson, had not released her to return to work due to her "extreme anxiety," which "has only increased over the past 2-3 years."  Dr. Vargo mentioned several medications that Haning was taking, including Percocet, Depakote, Relpax, and Lyrica, "as well as numerous other meds."  Dr. Vargo concluded that, as Haning's primary care physician, "I agree with the patient that she is NOT, at this time, able to return to work of any form."

After reviewing this information, Hartford contracted with third-party vendor MCMC to conduct another file review.  MCMC, in turn, assigned the review to three consultants (a rheumatologist, a neurologist, and a psychiatrist), each of whom concluded that Haning was not disabled from working.  The rheumatologist, Dr. Lesser, attempted to reach Haning's treating rheumatologist, Dr. Rosenberg, on three occasions, but failed to make contact.  Nevertheless, Dr. Lesser's file review found two potential issues: Haning's aneurism and her fibromyalgia.  As to the aneurism, Dr. Lesser stated that no additional serological testing was conducted to follow up on the initial finding, and then he concluded that "[s]ince a positive [aneurism] may be a false positive result, the finding of an isolated positive [aneurism] is of no clinical significance."  As to the fibromyalgia, Dr. Lesser noted that Dr. Rosenberg based this diagnosis on findings of "diffuse pain, fatigue, headaches, back pain, and self-reported sense of stiffness" rather than on "physical examination findings of trigger points," which Dr. Lesser deemed "essential for confirmation of this diagnosis."  Accordingly, Dr. Lesser concluded that "[f]rom a rheumatologic point of view, the medical documentation provided . . . do not provide clinical findings in support of [workplace] restrictions and limitations."

10

The neurologist, Dr. Gordon, attempted to reach Haning's primary care physician, Dr. Vargo, on three occasions, but similarly failed to make contact. Dr. Gordon then noted that the records showed that Haning suffered from headaches, neck pain, back pain, an aneurysm, and "give-way weakness" in her right leg. Dr. Gordon, however, found that none of these ailments amounted to a neurological disability. He first noted that while some of the case notes mentioned possible weakness of the right leg, "no electromyogram is provided to substantiate any suspicion of plexopathy or radiculopathy." He further noted that the attending physician had "doubts about the reported weakness" because Haning's "effect is poor" and "Hoover's sign is positive"—thus suggesting a "functional" element to the reported weakness. Dr. Gordon also discounted Haning's headaches, neck pain, and back pain because "there is no mention of basiar migraine, ataxia, or hemiplegic migraine," nor were "papilledema or other worrisome findings associated with [headaches]" noted. He further observed that a brain MRI from May 29, 2011, was normal. As to the aneurism, he noted that "this is reported to be incidental to the [headaches], not causative," and thus, not consequential. All told, Dr. Gordon concluded that "the provided records do not substantiate the claims of functional neurological impairment, and therefore, [Haning] is not restricted in terms of a Department of Labor work category."

Finally, the psychiatrist, Dr. Givens, spoke with Ms. Dickson, who told him that Haning suffered from depression, anxiety, stress, and physical problems. Ms. Dickson also reported that Haning complained of decreased memory and concentration. Nevertheless, Dr. Givens's report stressed that "[n]o specific testing or cognitive function is documented in the medical records provided or in the teleconference with [Ms. Dickson]." Accordingly, Dr. Givens found "no clinical observable evidence of cognitive dysfunction that would prevent [Haning] from being able to perform occupational duties."

11

By letter dated June 26, 2013, Hartford informed Haning that the company was standing behind its initial decision to terminate her benefits.  After summarizing the information provided on appeal and the reports conducted by MCMC's consultants, Hartford stated as follows: "Based on the totality of the information presented . . . includ[ing] . . . the claim file, the opinions of your own treating physicians and the reviews conducted by [Dr.] Robert Pelc, Dr. Bruce Leforce,[1] Dr. Robert lesser, Dr. Andrew J. Gordon[,] and Dr. Reginald A. Givens, we concur with the experts."  The letter further indicated that although Ms. Dickson and Dr. Vargo had opined that Haning was unable to work, they had not "provided documented clinical findings on examination and/or testing to support their rationale and opinions."  As such, Hartford concluded that Haning no longer was entitled to long-term disability benefits under the terms of the Plan. Haning timely filed this action under 29 U.S.C. § 1132(a)(1)(B).

## II.  STANDARD OF REVIEW

This Court reviews an ERISA plan administrator's termination of benefits de novo "unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits."  *Cox v. Standard Life Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009).  Here, the Plan grants such discretionary authority to Hartford.  Therefore, as the parties agree, the "arbitrary and capricious" standard of review applies.  *Id*.  The dual role and inherent conflict of interest of an insurer like Hartford in the administration and payment of claims is considered as a factor in this analysis, but it does not alter the "arbitrary and capricious" standard of review altogether.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008); *see also Cox*, 585 F.3d at 299 ("In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits.").

---

[1] Dr. Bruce Leforce completed a report dated February 18, 2011, with regard to Haning's prior claim for short-term disability benefits, which are not at issue in this case.

Under this deferential standard of review, where the plan administrator "offers a reasoned explanation, based on the evidence for a particular outcome, that outcome is not arbitrary or capricious." *Cox*, 585 F.3d at 299.  Put differently, the Court should consider whether Hartford's decision to terminate Haning's benefits was "the result of a deliberate, principled reasoning process . . . supported by substantial evidence." *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).  Although the Court's review is deferential, "it is not a rubber stamp for the administrator's determination." *Id.* ("[D]eferential review is not *no* review.").  Further, the Court is confined to examination of the administrative record.  *Farhner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011).

## III. ANALYSIS

Haning argues that Hartford's benefits termination constituted an arbitrary and capricious decision for a host of reasons, including: (1) Hartford's erroneous rejection of the opinions of her treating medical providers; (2) Hartford's improper overreliance on file reviews conducted by consultants that, in Haning's mind, formed a questionable basis for terminating her benefits; and (3) the structural conflict of interest inherent to any dual-hatted insurer and claims administrator like Hartford.  The Sixth Circuit recognizes all of these factors "as potentially indicative of arbitrary-or-capricious decision making." *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 604-05 (6th Cir. 2012); *see Zenadocchio v. BAE Sys. Unfunded Welfare Benefit Plan*, 936 F. Supp. 2d 868, 886-93 (S.D. Ohio 2013).  Therefore, this Court will consider each of Haning's arguments, while acknowledging that "[t]he ultimate issue . . . is not whether discrete acts by the plan administrator are arbitrary or capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quotation omitted).

13

A.  Hartford's Rejection of the Opinions of Haning's Treating Medical Providers

Haning first argues that Hartford's rejection of the opinions of her treating medical providers, one of whom had treated her for more than twenty years, did not demonstrate deliberate, principled reasoning.  This Court agrees.

Generally, a plan administrator may not summarily reject the opinions of a beneficiary's treating provider, but must instead give reasons for adopting an alternative opinion.  *Elliott*, 473 F.3d at 620.  To be sure, plan administrators "are not obliged to accord *special deference* to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (emphasis added).  But giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious.  *Elliot*, 473 F.3d at 620; *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) ("Whether a doctor has physically examined the claimant is indeed one factor that [courts] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").  The Sixth Circuit recognizes a number of examples of arbitrary disregard of the opinion of a treating provider, including the following:

> One situation is where the evidence from the treating physicians is strong and the opposing evidence is equivocal, at best, and also lacking in evidentiary support.  Another is where the contrary opinion . . . was not based on an examination of the claimant and was supported only by a selective, rather than a fair, reading of the medical records.  Arbitrary decisions may also include ones which accept a file reviewer's disregard of subjective reports of symptoms based solely on a review of medical records . . . and ones relying on an expert opinion that does not address crucial aspects of the claimant's former job and which is in conflict with other credible evidence in the record, including the opinion of the treating source.

*Zenadocchio*, 936 F. Supp. 2d at 888 (quotation and citations omitted) (collecting cases).  As explained below, the Court finds most (if not all) of these examples present.

14

### *1. Evidence from Haning's Treating Medical Providers Was Strong.*

Contrary to Hartford's contention, both Dr. Vargo and Ms. Dickson provided Attending Physician's Statements *before* Hartford terminated Haning's benefits that in no uncertain terms stated she was disabled from returning to work. Dr. Vargo returned one APS on June 8, 2011— on the form of Hartford's choosing no doubt—which explicitly diagnosed Haning with having "headaches, cervical spine stenosis, [and] cerebral aneurysm." When asked "[d]oes the patient have a psychiatric/cognitive impairment," Dr. Vargo marked the "yes" box and explained his diagnosis as "depression/anxiety, [and] intractable [headaches]." When asked whether, "based on your most recent clinical assessment," the patient is able to perform certain tasks in a general workplace environment, Dr. Vargo stated as follows: "Unable to work—intractable headaches/depression" before marking "N/A" as to various physical activities.

Dr. Vargo followed up roughly one year later with another APS at Hartford's request. Dr. Vargo's July 30, 2012 APS similarly diagnosed Haning with having "headaches, cervical spine stenosis, [and] cerebral aneurysm." This time, he listed as "current subjective symptoms" her "ongoing [and] continuous intractable [headaches] with cervical spine disc disease." Moreover, on a separate line entitled "Current Physical Examination findings," Dr. Vargo listed "[f]ibromyalgia, dizziness . . . depression[,] [and] anxiety." Here again, when asked whether Haning suffered from a "psychiatric/cognitive impairment," Dr. Vargo marked "yes" and explained his diagnosis as "[d]epression/[a]nxiety, [and] intractable [headaches]." And, just as before, when asked whether Haning was able to perform certain tasks "in a general workplace environment," Dr. Vargo explicitly stated as follows: "Pt. unable to work at all—intractable [headaches] + [d]epression—severe pain." As to the timeframe for these restrictions, he listed "indefinite."

Ms. Dickson submitted an APS at Hartford's request on November 1, 2012.  When asked to list "Observed symptoms (Clinical presentation, observations, examples)," Ms. Dickson stated "Sad, unhappy, limited social activities—sometimes needs assistance with daily activities." When asked about Haning's "Psychomotor activity," Ms. Dickson stated "Very limited." Ms. Dickson also diagnosed Haning as having a clinical disorder under the Diagnostic and Statistical Manual of Mental Disorders ("DSM").  In her APS, Ms. Dickson noted "296.32" on Axis I, which corresponds to "Major Depressive Disorder, Recurrent, Moderate" in the DSM. Ms. Dickson also noted "Severe" on Axis IV, for psychosocial/environmental problems. Moreover, Haning scored only 41 out of 100 for global assessment of functioning.  These diagnoses were in addition to Haning's "[s]elf-reported symptoms," which Hartford's form required Ms. Dickson to list separately.  Finally, when asked to rate Haning's ability to perform different workplace activities, Ms. Dickson marked "No Ability" for nine of twelve activities and "Minimal Ability (0-33% / day)" for three activities.  Ms. Dickson did not indicate "Full Ability" or even "Moderate Ability" for any activities.  Ms. Dickson noted that "[d]ue to chronic illness, [Haning] is unable to do/perform duties outside of minimal functioning ability."  When asked for Haning's "target date for return to work," Ms. Dickson stated flatly, "NONE."

The Court considers these repeated in-person evaluations from Haning's primary care physician (who had treated her for over twenty years) and her mental-health care provider (who treated her *at least* monthly for over a year) strong evidence of her long-term disability. *See Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d 779, 789 n.3 (S.D. Ohio 2008); *Weidauer v. Broadspire Servs., Inc.*, No. C-3-07-797, 2008 WL 4758691, at *11 (S.D. Ohio Oct. 27, 2008) ("In this case, however, deference must be given to the evidence submitted by Weidauer's treating physicians because they are the only ones who actually examined her.").

<u>*2.  The Opposing Evidence (Not Including the File Reviews) Was Weak.*</u>

Hartford offers several rejoinders.  *First*, Hartford claims that Dr. Vargo "initially declined to give any opinion regarding disability and did not provide an opinion until after Haning's benefits were terminated."  As noted, the administrative record refutes this statement.  Although Dr. Vargo *also* offered a letter in support of Haning's benefits appeal, he certainly weighed-in (twice) prior to Hartford's benefits termination.  To the extent that Hartford argues Dr. Vargo's "deferral" of workplace restrictions to Haning's neurologist and psychiatrist nullifies his earlier opinions that she was "unable to work at all," the Court is not persuaded.  To be sure, Haning's neurologist, Dr. Sun, opined that she did not have a "psychiatric/cognitive impairment," but Hartford's letter to Dr. Vargo requesting his "deferral" indicated only that Dr. Sun "noted function for work activity as relates to [Haning's] headaches"—it said nothing about Dr. Sun's opinions regarding Haning's depression and anxiety.  Further, to the extent Dr. Vargo purported to defer to Haning's "psychiatrist," Ms. Dickson—a licensed social worker—noted that "[Haning] is unable to do/perform duties outside of minimal functioning ability," and, when asked for a "target date for return to work," stated "NONE."  Thus, in truth, Dr. Vargo deferred to another treating examiner who herself found Haning disabled from work.

*Second*, Hartford contends that Dr. Vargo "appears to have based his opinion almost entirely (if not entirely) upon Haning's self-reported statements rather than upon any objective medical evidence."  But as a threshold matter, the Plan does not explicitly require "objective medical evidence" to show that a claimant is "disabled."  Instead, the Plan defines that term to mean the claimant is "prevented from performing one or more of the Essential Duties of Your Occupation . . . [and, after two years], of Any Occupation."  The Sixth Circuit has described similar ERISA plan definitions as "by [their] very terms subjective."  *Helfman v. GE Grp. Life*

*Assurance Co.*, 573 F.3d 383, 395 (6th Cir. 2009). Where, as here, "the Plan does not contain provisions that demand objective evidence as the sole grounds for disability or preclude reliance on subjective evidence or physical opinion. . . . Hartford cannot use this demand as grounds to give no probative value to other evidence." *Zenadocchio*, 936 F. Supp. 2d at 887.

Putting these matters of law aside, Dr. Vargo's Attending Physician's Statements—completed on Hartford's own forms—belie Hartford's argument that he relied entirely on Haning's self-reported statements. Dr. Vargo listed separately his "Primary diagnosis," "Secondary diagnoses," and "Current Physical Examination findings" from Haning's "Current Subjective Symptoms." This shows that Dr. Vargo viewed and documented his clinical, observable findings differently than Haning's self-reported complaints.

Even more to the point, Hartford relies on an overly crabbed view of what constitutes "objective medical evidence" and "documented clinical findings." Neither fibromyalgia nor depression easily lends itself to laboratory results or other quantitative medical testing. *See Holler v. Hartford Life & Accident Ins. Co.*, 737 F. Supp. 2d 883, 891 (S.D. Ohio 2010) ("A fibromyalgia diagnosis can be vexing because it cannot be confirmed by medical or laboratory testing and commonly turns on subjective reports of pain."); *James v. Liberty Life Assurance Co. of Boston*, 582 F. App'x 581, 588 (6th Cir. 2014) ("[P]sychiatrists typically treat symptoms that are subjective and must rely on a patient's subjective descriptions to evaluate and diagnose the patient."). Thus, Hartford was disingenuous to the extent it expected to find objective evidence of these ailments. *See James*, 582 F. App'x at 589 (finding claimant's combined diagnosis of pain and depression "not capable of confirmation through objective indicators").

*Third*, Hartford claims that "Dr. Vargo relied upon his wholly incorrect belief that a **psychologist** named 'Dr. Dixon' had taken Haning off of work due to mental/nervous issues, when, in fact a **counselor** named Ms. Dickson had suggested that Haning's mental/nervous issues were caused by her physical condition and had not taken her off work." Hartford finds support from Dr. Vargo's letter submitted in connection Haning's benefits appeal, where he mistakenly referred to Ms. Dickson as "Dr. Dixon." Semantics aside, Ms. Dickson was qualified under Ohio law to identify and treat Haning's mental illnesses. *See* Ohio Rev. Code § 4757.21 ("A person licensed under this chapter . . . may diagnose and treat mental and emotional disorders."). And, as described above, she *did* recommend that Haning not return to work due to psychiatric limitations, whatever their root cause.

*Fourth*, Hartford claims that Dr. Vargo "did not provide any specific restrictions or limitations on Haning's functional capacity." This is a curious position to take given that Dr. Vargo indicated Haning was "unable to work *at all*" due to her intractable headaches, depression, and severe pain. (Emphasis added).

*Fifth*, Hartford claims that Dr. Vargo "qualified his statement" that Haning was not able to return to work "by immediately stating that '[w]e would like more time for the medications to work,'" without describing the medications to which he was referring. Hartford is again referring to the letter Dr. Vargo submitted during the benefits appeal process. In fairness, Dr. Vargo did not specify which medications he was referring to in the same paragraph, though elsewhere in his letter, he noted that Haning was taking Percocet, Depakote, Relpax, "as well as numerous other meds." Thus, even if his statement regarding Haning's medications can be interpreted as a "qualification" to his otherwise unambiguous conclusion that "[Haning] is NOT, at this time, able to return to work in any form" (which is unlikely), Dr. Vargo supported it.

19

*Sixth*, Hartford claims that it reasonably rejected the opinions of Dr. Vargo and Ms. Dickson because two other treating physicians (Dr. Sun and Dr. Rosenberg) opined that she could return to work.  Hartford's assertion tells only half the story.  Dr. Sun and Dr. Rosenberg both agreed that Haning could perform "Sedentary Work on a full-time basis" within the meaning of Department of Labor regulations—*i.e.*, she could perform certain functional movements on a frequent basis or without restriction.  But neither physician addressed Haning's documented depression and anxiety or the effect those afflictions had on the other essential aspects of her job—including communicating with other people, both person-to-person and in group settings.  This piecemeal analysis falls short.  *See Zenadocchio*, 936 F. Supp. 2d at 892.

*Seventh*, Hartford *now* claims that it reasonably rejected Ms. Dickson's opinions for the following reasons:

> Ms. Dickson is a licensed social worker and not a Physician, which is what the Plan requires.  More importantly, she did not opine that Haning was disabled because of her mental/nervous condition.  Instead, she deferred to others to make that judgment and repeatedly stated that she believed Haning was impaired by her physical condition, not her mental/nervous condition.  Her office notes did not record diagnoses, mental status examinations, or GAF scores.  Finally, Haning had not been referred to any other mental health provider, was being counseled at a non-intense level (once or less per month) and was taking relatively low dosages of medication for anxiety/depression.

This argument lacks merit for several reasons.  For one thing, Hartford never questioned Ms. Dickson's qualifications in either its benefits-termination letter or its decision on appeal.  Nor, for that matter, did Hartford base either decision on Ms. Dickson's purported "deferr[al]" to others to make a recommendation or her belief that Haning was impaired by her physical condition and "not her mental/nervous condition."  This Court may not consider such post hoc justifications for a plan administrator's decision.  *See Crist v. Liberty Life Assurance Co. of Boston*, No. 3:04-CV-010, 2006 WL 1209350, at *9 (S.D. Ohio May 4, 2006).

Putting the issue of post hoc justifications aside, Hartford's arguments regarding its rejection of Ms. Dickson's opinions are simply wrong.  Contrary to Hartford's first assertion, nothing in the Plan precludes Hartford from considering evidence submitted by someone other than a "Physician."  Instead, the Plan merely requires that, to qualify for benefits, the claimant must be "under the Regular Care of a Physician."  Haning *was* "under the Regular Care of a Physician"—Dr. Vargo.  Moreover, as previously noted, Ohio law permits licensed professional counselors like Ms. Dickson to diagnose and treat mental disorders.  Contrary to Hartford's second assertion, while both Haning, and to a lesser extent, Ms. Dickson, traced the *source* of Haning's mental problems to concern about her physical conditions, Ms. Dickson reported that Haning was *mentally* debilitated because of those concerns.  Ms. Dickson told Hartford that Haning "can't deal with lack of motivation [and] acceptance of reality of her physical issues and how to adjust" and that her "inability to perform daily tasks is a depressant."  When asked what her target date was for returning to work, Ms. Dickson wrote "NONE."  Contrary to Hartford's third assertion, Ms. Dickson *did* record diagnoses, mental status examinations, and GAF scores.  On the very APS form that Hartford asked Ms. Dickson to complete, she explicitly diagnosed Haning with "Major Depressive Disorder, Recurrent, Moderate."  *See* Diagnostic and Statistical Manual of Mental Disorders 798 (4th ed. 1994).  She also recorded a GAF score of 41, which, means that Haning falls on the lowest end of people said to be suffering "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)."  *Id.* at 32.  And, contrary to Hartford's remaining assertions, Ms. Dickson reported that she saw Haning *at least* once a month and that both her availability for treatment and her ability to purchase medications were limited by her "physical status" and "finances"— not necessarily by the severity (or lack thereof) of her illnesses.

In sum, and before turning to the matter of Hartford's reliance on file reviews, the Court finds that "the evidence from the treating physicians was strong" in this case, and the opposing evidence was "equivocal, at best, and also lacking in evidentiary support."  *See Zenadocchio*, 936 F. Supp. 2d at 888 (quotation omitted).  This strongly suggests that Hartford "arbitrarily disregarded the opinion[s]" of Haning's treating medical providers.  *Id.*

<u>B.  Hartford's Reliance on File Reviews</u>

Haning next argues that Hartford's (near) exclusive reliance on a series of file reviews submitted by paid consultants shows that its benefits termination was arbitrary and capricious. Again, this Court agrees.

The Sixth Circuit recognizes that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  Moreover, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Id.* at 296. Nevertheless, the decision to rely on file reviews, rather than an in-person examination, is a factor properly considered in determining whether Hartford's decision was arbitrary and capricious.  *Kalish*, 419 F.3d at 508; *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 450 (6th Cir. 2008) (holding that plan administrator's reliance on file reviews "is a factor that must be considered" in determining whether benefits denial is arbitrary and capricious). Therefore, although the Court cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician," *Nord*, 538 U.S. at 834, the Court can, by itself, "consider the administrator's reliance on file reviews," *James*, 582 F. App'x at 587; *see also Pitts*, 534 F. Supp. 2d at 789 n.3 (holding that reviewing courts may give "special weight" to treating providers over "the opinion of a physician who never met with the Plaintiff").

22

As Haning notes, the Plan reserved to itself (and to Hartford) the right to require Haning to appear for an independent medical examination to assess her impairments.  Hartford never requested that Haning submit to an independent medical examination.  Instead, Hartford upheld its termination of benefits based almost entirely on a series of file reviews.

### 1.  The File Reviews Were a Questionable Basis for Denying Haning's Mental Health Disability.

The Sixth Circuit recently reminded courts and litigants alike that "file reviews are questionable as a basis for identifying whether an individual is disabled by mental illness." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014).  The reasons underpinning this view are clear:

> Courts discount the opinion of psychiatrists who have never seen the patient for obvious reasons.  Unlike cardiologists or orthopedics, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjection symptoms. . . . [W]hen a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," . . . a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008) (quotation omitted); *see also, e.g.*, *James*, 582 F. App'x at 589 ("Unlike most doctors . . . a psychiatrist must treat a patient's subjective symptoms by interviewing the patient and spending time with the patient so as to understand and treat the subjective symptoms described by the patient."); *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168-69 (2d Cir. 2006) ("First-hand observation is especially important in the context of assessing psychiatric disabilities."). Accordingly, where a plan administrator possesses the right to order an independent medical examination but "fail[s] . . . to take advantage of that option" when adjudicating a claim of mental and emotional stability, the administrator's decision "is both puzzling and troubling." *Smith*, 275 F. App'x at 508 (holding that benefits denial was arbitrary and capricious).

Lower courts, including this one, frequently find that plan administrators act arbitrarily when they rely solely on file reviews to deny disability claims based on mental illness. *See Rohr v. Designated Telecomms., Inc.*, No. 2:08-cv-345, 2009 WL 891739, at *9-10 (S.D. Ohio March 30, 2009) ("Plaintiff's treating therapist specifically concluded that her depression prevented her from engaging in the required duties of her position . . . . Jefferson Pilot's rejection of these opinions [based on a file review] adds to the evidence before this Court that its termination of Plaintiff's disability benefits was arbitrary and capricious."); *accord Allen v. AT&T Disability Income Program*, No. 3:08-cv-884, 2009 WL 2366418, at *14 (M.D. Tenn. July 29, 2009) ("Sedgwick's dependence on the mental health evaluations provided by non-treating physicians was unreasonable, especially considering that it had the option to order an independent medical examination.").

Here, the same problems pervade Hartford's benefits termination.  Despite the fact that Haning's treating providers opined that she suffered from disabling depression and anxiety, Hartford terminated her benefits anyway based on the opinions of two consultants who never examined her.  Hartford's consultant on administrative appeal, Dr. Givens, spoke to Haning's therapist, Ms. Dickson on the phone.  After that conversation, he noted that she reported Haning suffered from depression and anxiety, did not bath regularly, had a delayed response to recalling anything, and self-reported decreased memory and concentration.  Nevertheless, Dr. Givens found that "there are no applicable restriction[s] and limitations that are supported from a psychiatric perspective."  Dr. Givens based his opinion on the assertion that "[n]o specific testing or cognitive function is documented in the medical records or in the teleconference with Ms. Debbie Dickson"—even though Ms. Dickson's APS clearly documented that Haning suffered from "Major Depressive Disorder, Recurrent, Moderate," scored only a 41 out of 100 on global

assessment of functioning, and could not return to work. Thus, without ever examining Haning, and in the face of directly conflicting evidence from her therapist, Dr. Givens concluded that she could return to work immediately. This approach adds to the evidence that Hartford's decision was arbitrary and capricious. *See Rohr*, 2009 WL 891739, at *9-10.

Hartford notes that it relied on the opinions of a different consultant, psychologist Dr. Robert Pelc, when *initially* terminating Haning's benefits, and that unlike Dr. Givens, Dr. Pelc at least spoke with Haning on the telephone. Fair enough. Although Dr. Pelc, like Dr. Givens, never personally examined Haning, he did speak with her on the telephone. Query, however, whether Dr. Pelc could glean satisfactory psychological information from a telephone interview alone. *See Winkler*, 170 F. App'x at 168-69 ("*First-hand* observation is especially important in the context of assessing psychiatric disabilities." (emphasis added)). Without the ability to observe physical indicia of Haning's mental illness—including her affect, her motor movement, her posture, her clothing, and her hygiene—Dr. Pelc's telephone interview may be of limited value, especially when stacked against the opinions of Dr. Vargo and Ms. Dickson, who both had ample opportunity to personally examine Haning. Query also whether the "evidence" obtained from a telephone conversation that Dr. Pelc summarized is reliable. *See Mitchell v. The Hartford*, No 3:05CV-432-H, 2006 WL 1548956, at *5 (W.D. Ky. June 2, 2006) ("[T]he use of quotes from telephone conversations raises even greater concerns. These statements are second hand and completely unverified. These circumstances lend themselves to a high probability of misuse."); *Cavaretta v. Entergy Corp. Companies' Benefits Plus Long Term Disability Plan*, No. CIV.A. 03-1830, 2004 WL 2694895, at *11 (E.D. La. Nov. 23, 2014) (sternly questioning Hartford's practice of relying on its consultants' summaries of phone conversations).

Putting aside the limited value and questionable nature of Dr. Pelc's telephone interview, his conclusion that Haning was not disabled seems totally at odds with his summary of their conversation, where he remarked as follows:

> Throughout the course of the interview, she was difficult at times to understand and required refocus to questions that have been asked.  Her speech was slow, labored, and low in volume.  She often mispronounced words.  She repeated herself.  Her speech was generally halted. . . .

> She then digresse[d] to talk about living in the dark in her own home.  She then stated that she was having panic attacks and just felt out of control.  Currently, she reports continued decrease in memory, social avoidance, tearfulness, feeling declining in terms of physical functioning, and generally limited in her capacity to perform even [activities of daily living]. . . . She noted that she will often wear a baseball cap and be covered because of her light avoidance.  She does not drive, shop, or cook.  She admitted to being embarrassed to tell me that she showered about once per month.  She does not perform household chores.  She does not engage in money management.  She was unable to describe any recreational activities, noting that she had even forgotten how to use a computer.  When asked about social activity, she stated that she was simply too ill to do so.  She did not perceive any improvement in her condition, and instead believed that she has simply declined further.

> From a mental health perspective, she sees a therapist once per month.  However, she noted that she had to cancel several appointments because of her ill health. . . . She is currently medicated with Xanax, 2 to 3 mg per day, and Celexa, 20 to 40 mg per day.  She saw minimal gain from her current mental health care.  Her treating providers told her that she will simply not be able to return to work.

> . . .

> When asked about her actual capacity to perform routines on a daily basis, she stated that she walks with a cane, sits on a heating pad most of the day, and generally does not move.  Asked about going out for appointments, she stated that someone will take her.  However, she also noted that she frequently will cancel appointments because of her panic attacks. . . .

> [S]he stated that she simply could not understand why she had deteriorated to this level.  She felt that she was simply not the same person that she previously had been.  She is unable to remember.  She has difficulty talking to other people.  She described herself as a person who hid from others and called herself "a hermit."  She then noted that she was hoping that something would happen that would change her circumstances.  She did digress at that point and began describing details of numerous physical health problems.

26

Dr. Pelc then concluded that "[t]he current evidence would not support the presence of functional impairment related to this claimant's psychological condition."  He did not, however, challenge Haning's statements in any way.  He did not state that he thought Haning was lying or malingering.  He simply reported his summary of the interview and then rendered a conclusion that does not follow from it.  Hartford's reliance on Dr. Pelc's opinions therefore also suggests arbitrary and capricious decision-making.  *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 168-70 (6th Cir. 2007) (noting that reviewing physicians' reports, which determined that the claimant's functional capacity was "insufficient to support a finding of disability," were "inexplicabl[e]," internally inconsistent, "conclusory and unsupported").

Any reliance on Dr. Pelc's telephone interview of Ms. Dickson seems equally suspect because his interview notes contradict the APS she submitted to Hartford just two months prior.  For example, Dr. Pelc noted that Ms. Dickson "did not have a specific GAF score [for Haning]," when, in fact, Ms. Dickson scored Haning with a 41 out of 100 on November 1, 2012.  Similarly, Dr. Pelc indicated that Ms. Dickson "deferred essentially to [Haning's] physicians" as to her potential return to work when, in fact, Ms. Dickson previously informed Hartford that Haning's symptoms were "of such severity that [they] would preclude [her] from social/occupational functioning" and listed a target date for return to work as "NONE."

### 2. *The File Reviews Improperly Disregarded Haning's Complaints.*

The Sixth Circuit also deems reliance on file reviews "inappropriate where a claims administrator disputes the credibility of a claimant's complaints."  *Javery*, 741 F.3d at 702; *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) ("[W]e will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility.").

Here, none of the file reviewers stated that he had reason to doubt Haning's credibility. Nor can this Court divine any reason to doubt her credibility from its review of the record.  Yet three of the reviewers challenged Haning's complaints regarding the debilitating effect of her diagnosed fibromyalgia, intractable headaches, and depression.   For example, Dr. Lesser challenged Haning's fibromyalgia disability which, by its very nature, "commonly turns on subjective reports of pain," *Holler*, 737 F. Supp. 2d at 891, due to a purported lack of "demonstrated physical findings."   Dr. Gordon, in turn, doubted that her headaches were disabling because there was "no mention of basiliar migraine, ataxia, or hemiplegic migraine." Finally, Dr. Givens discounted any mental-health disability because "there is no clinical observable evidence of cognitive dysfunction that would prevent [Haning] from being able to perform occupational duties."

Despite Hartford's near exclusive reliance on its consultants' opinions that Haning lacked objective medical evidence of fibromyalgia or debilitating headaches, "[c]omplaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient." *See James*, 582 F. App'x at 589.   Therefore, "courts considering this issue have found it inappropriate for an administrator to dismiss a claimant's self-reports and other subjective evidence of disability, particularly where the administrator has no basis for believing the evidence is unreliable."   *Id.*   Likewise, the Court finds unpersuasive Hartford's reliance on Dr. Givens's opinion regarding a lack of objective medical evidence or formal mental status examinations.  *See Kinser v. Plans Admin. Comm. of Citigroup, Inc.*, 488 F. Supp. 2d 1369, 1381 (M.D. Ga. 2007) ("[P]syschiatric conditions such as Plaintiff's are not easily proven by purely 'objective' measures. . . . To the extent [they] can be established by 'objective' evidence, Plaintiff's medical records do reveal 'objective' clinical observations.").

Furthermore, the Court finds unpersuasive Hartford's argument that the frequency (Ms. Dickson saw Haning monthly) and intensity (Ms. Dickson did not refer Haning to another provider or increase her prescriptions) of Haning's treatment supports its decision to discount her subjective complaints of mental illness. *Id.* The fact that Ms. Dickson "did not increase [Haning's] office visits or change her medication only supports [Haning's] position that she continued to be disabled, and [that] her condition had not changed." *Id.*

As this Court previously found, "[i]n the context of a claimant with self-reported symptoms, the plan administrator must follow a reasonable procedure in deciding the issue." *Zenadocchio*, 936 F. Supp. 2d at 890; *see Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 793 (M.D. La. 2007) ("A plethora of cases have held that subjective evidence cannot be discounted solely because it is subjective."). Here, as in *Zenadocchio*, the file reviewers in-question "never interviewed" Haning, nor did Hartford obtain "surveillance footage of [her] (despite Hartford's efforts to attain such footage) to support its decision to rely on the opinion[s] of [Dr. Lesser, Dr. Gordon, and Dr. Givens.]" 936 F. Supp. 2d at 891. Instead, "Hartford made the credibility determination as to [Haning's] claimed disability without the benefit of evidence that refuted [her] statement[s] that she was unable to work and without taking reasonable measures to decide the issue, such as conducting an in-person examination." *Id.*; *Kinser*, 488 F. Supp. 2d at 1381 ("Furthermore, [Hartford] could have required Plaintiff to obtain a formal mental status evaluation, but it did not do so."). The Court is not claiming Hartford was under an absolute responsibility to perform an in-person examination. Nevertheless, "Hartford's decision in regard to [Haning's] 'self-reported symptoms' does not reflect deliberative, principled reasoning, but instead weighs toward the Court's conclusion that Hartford's decision to terminate was arbitrary and capricious." *See Zenadocchio*, 936 F. Supp. 2d at 891.

29

### *3.  The File Reviews Did Not Assess Crucial Aspects of Haning's Occupation.*

Finally, the Sixth Circuit has admonished plan administrators not to overlook the intellectual or social aspects of a claimant's job when terminating or denying their disability benefits.  *Javery*, 741 F.3d at 702 (collecting cases) ("We also found it troublesome that Dr. Goldman ignored the intellectual aspects of Plaintiff's job as a software engineer."); *see also Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 377 n.3 (6th Cir. 2011) ("[M]ere mention of Hunter's job description, without analysis, is insufficient to demonstrate that these physicians actually considered Hunter's ability to perform the physical demands of her prior occupation."); *Elliot*, 473 F.3d at 619 ("[T]here is no indication that Metlife reasoned from Elliot's condition to her ability to perform her occupation. . . . Instead, the denial letter is a mere recitation of medical terminology employed by various physicians in their diagnoses of Elliot's condition, without any reasoning as to why those diagnoses would permit her to function in the workplace."); *Zenadocchio*, 936 F. Supp. 2d at 892 ("Hartford did not properly consider the entire scope of Zenadocchio's essential duties of her position in accordance with her limitations."); *Rohr*, 2009 WL 891739, at *11 ("Jefferson Pilot ignored the most significant aspects of Plaintiff's job, *i.e.*, the intellectual and/or mental functions.").

Here, Hartford based its termination decision solely on a "Physical Demands Analysis" solicited from Chase and the findings of its consultants in relation to those physical demands.  It seems as though Hartford overlooked *all* intellectual or social aspects of a Customer Care Research Associate when terminating Haning's disability payments.  Assuming for the sake of argument that Haning can do the lifting, walking, sitting, and standing required for her "sedentary" job (despite credible evidence in the record that she cannot), it does not follow that she also can perform the mental or intellectual processes associated with such a job.

Moreover, even under Hartford's strained analysis, which seems to have taken into account only the physical aspects of Haning's occupation, Hartford still misses the mark. Chase listed the following as "essential [physical] job duties" of a Customer Care Research Associate: (1) using a computer; (2) using a telephone; (3) talking person to person and in group settings; and (4) hearing in person and in group settings. Certainly Haning's diagnosed depression, anxiety, and headaches factor into these essential job duties—before even considering other matters like following directions and procedures, performing repetitive or short-cycled work, and the like. Simply concluding, without more analysis, that a claimant who can perform sedentary or light levels or work can also perform all of the essential functions of her own occupation seems neither reasoned nor reasonable. *See Elliot*, 473 F.3d at 618 ("Logically, MetLife could have made a reasoned judgment only if it relied on medical evidence that assessed Elliot's physical ability to perform *job-related tasks*. . . . Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability." (emphasis added)).

Hartford's initial benefits-termination letter, which found that Haning was not disabled from "any occupation" either—supports the notion that Hartford assessed only Haning's physical limitations, and not the intellectual or social limitations that her ailments imposed. In describing its decision to terminate her benefits, Hartford noted that "we investigated whether you could perform the duties of Any Occupation . . . . [and] performed an employability analysis which showed that there are a number of occupations for which you are qualified *that are within your physical capabilities*." (Emphasis added). Hartford then went on to list several occupations for which Haning appeared qualified, including "Clerk, General; Waiter/Waitress, Informal; Deliverer, Outside; and Office Helper," to name a few.

31

Hartford made absolutely no mention, however, of whether a woman diagnosed with "Major Depressive Order, Recurrent, Moderate," who fell on the lowest end of people who suffered "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," who was found to have "No Ability" to perform repetitive or short-cycled work, to work effectively under stress, to work under specific instructions, or to deal with people (among other significant limitations), and who reported essentially living the life of a hermit could perform those jobs. This decision too seems unreasoned and unreasonable. *See VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 614-15 (6th Cir. 1992) ("We agree . . . that the phrase 'prevented from engaging in every business or occupation' [in an ERISA plan] cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled and that nominal employment, such as selling peanuts or pencils which would yield only a pittance, does not constitute a 'business or occupation.'" (quoting *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir. 1988))). Instead, "a claimant's entitlement to payments based on a claim of total disability must be based on the claimant's ability to pursue gainful employment *in light of all the circumstances*." *Id.* (quotation omitted).

All told, the Court cannot conclude that Hartford's explanation for rejecting Dr. Vargo's and Ms. Dickson's recommendations regarding their own patient was reasoned or reasonable. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 382 (6th Cir. 2005). It simply "is not enough for [Hartford] to offer an explanation for the termination of benefits; the explanation must be consistent with the quantity and quality of the medical evidence that is available on the record." *Id.* at 381 (quotation omitted) (finding administrator's benefits decision arbitrary and capricious). The combination of factors described above leads the Court to this conclusion.

## C.  Hartford's Inherent Conflict of Interest

There remains, moreover, Hartford's inherent conflict of interest.  Both parties agree that Hartford labored under such a conflict because every dollar that Hartford pays out is one less dollar that goes toward Hartford's bottom line.  *See Flanigan v. Liberty Life Assurance Co. of Boston*, 277 F. Supp. 2d 840, 843-44 (S.D. Ohio 2003) ("Defendant Liberty Life both funds and administers the Policy.  Accordingly, Liberty Life incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits.  Defendant Liberty Life therefore clearly has a conflict of interest, and such conflict must be weighed as a factor . . . .").  Hartford's conduct in administering Haning's claim, "which consisted of selective deference to opinions and medical evidence regarding [her] eligibility, renders the conflict of interest significant."  *See Zenadocchio*, 936 F. Supp. 2d at 886 (citing *Kalish*, 419 F.3d at 501); *see also Holler*, 737 F. Supp. 2d at 892 ("Defendant's emphasis on its own doctor's record review and its de-emphasis of the opinions of Plaintiff's treating physicians is a serious concern that taken together with some degree of conflicting interests can properly be the basis for setting aside an insurer's discretionary decision." (quotation omitted)).

Moreover, Hartford's half-completed form letter from October 4, 2012, indicating that the company was terminating Haning's benefits before even receiving Ms. Dickson's APS or assigning Dr. Pelc to conduct an initial review, "certainly indicate[s] a predisposition toward terminating [Haning's] benefits and manifest[s] the conflict of interest inherent in [Hartford's] dual role as the decision-maker and payor" of the long-term disability policy.  *See Evans*, 434 F.3d at 880.  Essentially, Hartford started with a conclusion (to deny Haning's benefits) and then worked backwards to fill in the blanks as to when and why.  This suggests that Hartford's conflict of interest unduly influenced its decision to terminate Haning's benefits.  *See id.*

At bottom, Hartford's unsupported (and at times internally inconsistent) rejection of the opinions of Haning's treating medical providers, coupled with its questionable reliance on file reviews that were, under the circumstances, insufficient to support the termination decision, rendered the termination of Haning's benefits arbitrary and capricious. *See Smith*, 275 F. App'x at 509 (describing "obvious shortfall[s] in the analytical framework used by the experts credited by the plan administrator" before concluding that benefits termination was "arbitrary and capricious"). No single factor led the Court to this result. Rather, the "cumulative effect" of the foregoing factors, coupled with Hartford's inherent conflict of interest in this case, described above, leads the Court to conclude "that Hartford's decision was *not* supported by a reasonable explanation and was therefore, arbitrary and capricious." *Zenadocchio*, 936 F. Supp. 2d at 885.

## D.  Remedy

Having found that Hartford's termination of benefits was arbitrary and capricious, the Court turns to the proper remedy. Generally, "courts may either award benefits to the claimant or remand to the plan administrator." *Elliot*, 473 F.3d at 621. A remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Id.* at 622; *see also Kalish*, 419 F.3d at 513 (concluding that where claimants have clearly established their disability, the appropriate remedy is an immediate award of benefits rather than a remand to consider previously ignored evidence). As the Sixth Circuit has warned, "[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits." *Cooper*, 486 F. 3d at 172. Instead, "[t]hey need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Id.*

34

In this case, Haning's treating medical providers repeatedly indicated that she was disabled from returning to work due to her debilitating headaches, fibromyalgia, depression, and anxiety.  Hartford initially agreed and awarded long-term disability benefits but subsequently terminated them as a result of an arbitrary and capricious decision—one that relied on a selective and at times internally inconsistent reading of the available medical evidence.  Under these circumstances, and because Haning was clearly entitled to disability benefits, a retroactive award is warranted.  *See, e.g.*, *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000); *Rohr*, 2009 WL 891739, at *12.  Furthermore, Hartford did not argue that the Court should remand Haning's claim for reconsideration in the event that the Court found the benefits termination arbitrary and capricious—thus forfeiting the issue.  *See Helton v. AT&T, Inc.*, 709 F.3d 343, 360 (10th Cir. 2013) (holding that plan administrator waived right to remand by failing to raise the matter before the district court); *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 372 n.7 (6th Cir. 2009) (stating that plan administrator would have waived right to argue remand is the appropriate remedy for improper denial of benefits had it not raised the issue before the district court).  The Court recognizes, however, that the terms of the Plan permit Hartford to require *continued* proof of Haning's disability for her benefits to continue and that, as of this date, her continued disability must relate only to "any occupation."  This opinion does not limit the applicability of those provisions.  *See Cooper*, 486 F.3d at 173.

## IV.  CONCLUSION

Accordingly, the Court **GRANTS** Haning's motion for judgment on the administrative record (Doc. 14), **DENIES** Hartford's motion for judgment on the administrative record

(Doc. 13), and **DENIES AS MOOT** Hartford's motion for leave to file a memorandum in reply

(Doc. 21).  Haning is entitled to long-term disability benefits retroactive to February 10, 2013.

      **IT IS SO ORDERED.**


                **___s/ Algenon L. Marbley_____**
                **ALGENON L. MARBLEY**
                **UNITED STATES DISTRICT JUDGE**

**DATED:  September 30, 2015**